IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 08-659 |
| | : | |
| TERRANCE CHATMAN | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **October 15, 2010**

Defendant Terrance Chatman asks this Court to suppress evidence seized during a warrantless search of his residence on December 14, 2007, arguing the search was not supported by reasonable suspicion evidence of criminal activity would be present at the residence and was not reasonably related to a suspected parole violation by Chatman. Because the search was supported by reasonable suspicion, Chatman's motion will be denied.

## FINDINGS OF FACT[1]

1.      In December 2007, Chatman was on parole following a conviction and prison term for the offense of possession of a firearm by a person prohibited from doing so. He previously had been convicted in Pennsylvania state court of firearms offenses, escape, and possession with intent to deliver cocaine.

2.      When he was released on parole on August 17, 2007, Chatman was initially released to a halfway house in Philadelphia. The Pennsylvania Board of Probation and Parole subsequently granted Chatman permission to move to his mother's residence at 401 West Fornance Street, Norristown, Pennsylvania 19401 (the approved residence), effective

---

[1] The following findings are based on the testimony of parole agent Harry Gaab and the exhibits introduced by the Government at the August 31, 2010, hearing on Chatman's motion to suppress.

October 16, 2007, at which time he came under the supervision of parole agent Harry Gaab.

3. Gaab has been a parole agent with the Pennsylvania Board of Probation and Parole since December 1995 and has supervised between 800 and 1,000 parolees during his tenure. The vast majority of his caseload (about 75%) consists of individuals convicted of narcotics offenses. As a parole agent, he has received training on a variety of subjects, including the proper chain of custody for urinalysis samples and how to analyze the level of an illegal substance in such a sample.

4. When Chatman came under Gaab's supervision in October 2007, Gaab was aware of Chatman's prior criminal history, including his prior drug convictions.

5. When he was released on parole, Chatman signed a form entitled "Conditions Governing Parole/Reparole." Ex. G1. The form required Chatman to submit to urinalysis testing and to "abstain from the unlawful possession or sale of narcotics and dangerous drugs" as a condition of his parole. *Id.* It also prohibited him from having contact with persons who sell or use drugs outside a treatment setting; consuming or possessing alcohol; and having contact with certain individuals, including James Walters, who previously had been supervised by Agent Gaab's office for a drug offense and was known to the Norristown Police Department as drug dealer who sold cocaine.

6. Chatman was also required to obey a curfew, which required him to be at his approved residence between 8:00 p.m. and 6:00 a.m.

7. As a condition of his parole, Chatman was also required to comply with the provisions of the Pennsylvania Vehicle Code, which prohibits driving without a valid license. Ex. G1. Chatman was thus not permitted to drive while on parole because his Pennsylvania driver's

license was suspended.

8.  By signing the "Conditions Governing Parole" document on August 17, 2007, Chatman acknowledged the above restrictions, consented to the search of his "person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole," and agreed "[a]ny items, in the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process." Ex. G1.

9.  On November 1, 2007, Gaab shipped a urine sample from Chatman to Kroll Laboratory Specialists (Kroll) for analysis. On November 3, 2007, Gaab received Kroll's report reflecting that Chatman's sample tested positive for a low level of cocaine, 359 nanograms per milliliter (ng/ML). Ex. G3. This result concerned Gaab because in his experience, individuals who are abusing cocaine often test positive for relatively high levels of cocaine in their systems, while the urinalysis samples of individuals who handle or package cocaine often show only low levels of cocaine, between 150 and 400 ng/mL.

10. Chatman provided another urine sample a week later, on November 8, 2007. The Kroll report again reflected a low level of cocaine, 196 ng/mL. Ex. G4. This result again concerned Gaab, leading him to believe Chatman had handled or used cocaine a second time.

11. On November 19, 2007, Gaab conducted a curfew check of Chatman at his approved residence around 10:00 p.m. Chatman's mother answered the door, permitted Gaab to enter the home, and explained Chatman had gone to the pharmacy to pick up her medication. Chatman had not received permission to leave the approved residence past his curfew for this reason. Gaab entered the residence and went down to the basement where Chatman claimed

to live and sleep. He noticed men's clothing and shoes, suggesting Chatman was in fact living there.

12. On November 21, 2007, Gaab drove by Chatman's approved residence and noticed a beige Chevrolet Tahoe parked alongside Chatman's mother's car, a dark blue Toyota Camry. Gaab thereafter ran a check of the Tahoe's license plate and learned it was registered to a Norristown resident named James Walters.

13. Gaab believed the James Walters to whom the Tahoe was registered was the same James Walters with whom Chatman was prohibited from having contact. The presence of the Tahoe at Chatman's approved residence was thus of concern to Gaab because it suggested he had violated the condition of his parole prohibiting him from having contact with Walters, a known drug dealer.

14. On November 26, 2007, Gaab conducted another curfew check of Chatman. Arriving at Chatman's approved residence around 10:00 p.m., Gaab knocked on the front and side doors and the basement windows, but received no answer. After knocking for about four to five minutes, loudly enough that a neighbor turned his lights on, Gaab left written instructions for Chatman to report to his office at 9:00 a.m. the following day.

15. On November 27, 2007, Chatman appeared at Gaab's office. Chatman, who was employed by a heating and air conditioning company, was wearing "work clothes." Rather than meet with Chatman, Gaab had another parole agent dismiss him so Gaab could surveil Chatman. Chatman told the parole officer who saw him in place of Gaab he had to leave because he had to go to work. Gaab observed Chatman leave the parole office, get into the passenger seat of his mother's Camry, and return to his approved residence with his mother driving.

Thirty minutes later, Gaab observed Chatman leave the residence wearing black pants and a black coat, rather than his work clothes. Gab saw Chatman get into the driver's seat of the Tahoe and drive away, in violation of the conditions of his parole.

16.     At a meeting in his office, on November 29, 2007, Gaab asked Chatman about his November 26 curfew violation. Chatman told Gaab he fell asleep with the radio on and did not hear Gaab knocking. Once again, Gaab had another parole agent dismiss Chatman, leaving Gaab free to surveil him. Gaab observed Chatman get into the passenger seat of the Camry and return to the approved residence. At the residence, Gaab observed Chatman change a tire on the Camry, entering and exiting the Tahoe several times to obtain tools.

17.     On December 6, 2007, Chatman again reported to Gaab's office. Prior to the meeting, one of Gaab's supervisors told Gaab he had seen someone he thought was one of Gaab's parolees driving a Chevrolet Tahoe in the parking lot. The supervisor identified Chatman, who was waiting in the lobby area of the office, as the person he had seen driving the Tahoe. After Gaab met with Chatman that morning, Gaab observed Chatman drive away from the office in the Tahoe with his mother in the passenger seat, in violation of the conditions of his parole.

18.     On December 12, 2007, Gaab went to Chatman's approved residence and knocked on the door at around 9:30 a.m. Both the Tahoe and the Camry were parked outside the residence. Receiving no answer, Gaab left written instructions for Chatman to report to his office on December 14, 2007.

19.     On December 14, 2007, as a result of his parole violations, parole agents prepared to take Chatman into custody and search his approved residence. While another parole agent

5

conducted surveillance of Chatman's approved residence, Chatman arrived at Gaab's office shortly after 10:00 a.m., smelling strongly of alcohol. When questioned by Gaab, Chatman admitted he had drunk one to two beers the night before and used cocaine three weeks earlier.

20.     Gaab then searched Chatman's person and found $570 in his right pants pocket. Although it was a Friday, which is often a payday, Gaab knew Chatman's take-home pay was only $386.11 per week. *See* Ex. G5 (Chatman's pay stub for the period 12/10/07–12/14/07, showing net pay of $386.11). Chatman's possession of $570 in cash concerned Gaab because, in his experience, drug dealers tend to carry a lot of cash on Friday mornings to enable them to purchase drugs to sell for the weekend.

21.     Following the discovery of cash on Chatman's person, Gaab and another parole agent approached the Camry, identified themselves to Chatman's mother, who was seated in the driver's seat, and explained that Chatman was in custody and they had to conduct a search of the passenger side of the vehicle, where Chatman had been seated. Gaab found a cell phone and keys on the floor of the passenger side and a lock blade knife on the center console. Although Chatman's mother said the knife belonged to her, she was unable to explain how to open or close it. Suspecting the knife in fact belonged to Chatman, the agents confiscated it along with the keys and cell phone.

22.     Gaab and other agents went to Chatman's approved residence. Using the keys they found in the Camry, agents searched the Tahoe, which was parked outside the residence, and found Chatman's wallet but no contraband. Agents then entered the residence, again using the keys they found in the Camry. While clearing the residence to make sure no one was hiding

within, Gaab saw latex gloves and torn plastic baggies with white residue, which Gaab believed to be cocaine, around the corner of a bar located in the basement. A further search of the basement by other agents yielded a significant amount of cocaine, a loaded 40 caliber pistol, a 100 gram weight of a type used for narcotics trafficking, a digital scale, and other packaging material.

23.   Upon learning from Chatman's mother that he also used a second floor bedroom, agents searched that room as well and found torn baggies in the trash can, a significant amount of cash,[2] Chatman's clothing, and written documentation regarding his parole supervision.

**DISCUSSION**

The Fourth Amendment ordinarily requires government officials "to have both probable cause and a warrant to conduct a search." *United States v. Baker*, 221 F.3d 438, 443 (3d Cir. 2000). When a parolee is involved and has signed a consent agreement permitting warrantless searches of his person, property, and residence, however, "the parolee's reasonable expectation of privacy is decreased and the government's reasonable need to monitor his behavior is increased." *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005). As a result, in the case of parolees, "the requisite level of suspicion is reduced and a warrant is not required" such that parole officers may search a parolee's car or home "on the basis of reasonable suspicion alone." *Baker*, 221 F.3d at 443-44. The decision to search must be based on specific facts giving rise to a parole officer's suspicion there would be some evidence of a parole violation in the residence searched; however, "the officer need not possess probable cause." *Id.* at 444 (internal quotation marks and citations omitted). The Pennsylvania Constitution "'provides a parolee with no greater protection than the United States

---

[2] According to Chatman's motion, $8,000 in cash was seized from his approved residence.

Constitution in the area of warrantless searches of a parolee's approved residence, where the parolee has signed a parole agreement in which he agreed to the search of his premises as a condition to the parole.'" *Williams*, 417 F.3d at 378 (quoting *Commonwealth v. Hughes*, 836 A.2d 893, 899 (Pa. 2003)).

To determine whether a search was supported by reasonable suspicion, a court "must look at the 'totality of the circumstances' of [the] case to see whether the . . . officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Although an officer may not rely on a "mere hunch" to justify a search, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (internal quotation marks and citations omitted).

Chatman argues the warrantless search of his approved residence on December 14, 2007, violated his rights under the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution because the parole officers lacked reasonable suspicion evidence of criminal activity would be present at his approved residence and because the search was not reasonably related to any alleged parole violations. Chatman does not challenge the search of his person or either of the vehicles.

Chatman's argument is without merit, as based on the totality of the circumstances, Gaab possessed a reasonable suspicion Chatman had committed parole violations and that evidence of such violations would be found at his approved residence. Gaab knew Chatman had tested positive for cocaine twice the previous month, both at relatively low levels, which, in Gaab's experience, suggested Chatman was handling cocaine. *See United States v. Tirado*, 133 F. App'x 13, 16 (3d Cir.

2005) (commenting that "a positive drug test alone has been held to be reasonable suspicion to support a search of a probationer's residence"). Gaab also knew Chatman had prior convictions for possession with intent to distribute cocaine. In addition, on multiple occasions, Gaab had observed Chatman driving and freely accessing a Chevrolet Tahoe registered to a James Walters, who Gaab reasonably believed was a known drug dealer with whom Chatman was prohibited from having contact. On one such occasion, Gaab observed Chatman driving the Tahoe after changing out of his work clothes in the middle of the workday, notwithstanding that Chatman had just told another parole officer he had to leave the parole office to go to work. Once Gaab searched Chatman's person, moreover, he recovered $570 in cash. The discovery of such a large amount of cash on Chatman on a Friday morning further strengthened Gaab's suspicion Chatman was dealing drugs, because the amount recovered exceeded Chatman's weekly take-home pay and was consistent with the cash-carrying habits of drug dealers.

These circumstances, taken together, amply support a reasonable suspicion Chatman was involved in the unlawful possession or sale of narcotics and was impermissibly in contact with James Walters, and that evidence of such violations could be found in Chatman's approved residence. *See Williams*, 417 F.3d at 376-77 (holding a parole officer's search of a parolee's residence was supported by reasonable suspicion where the officer knew the parolee had numerous parole violations, including storing ammunition at his residence; had received tips the parolee was dealing drugs and someone wanted to shoot him; had learned from the parolee that people were looking for him; and had been told by a police officer the parolee might have information about a homicide and might have a firearm); *Tirado*, 133 F. App'x at 18 (holding parole agents had reasonable suspicion to search parolee's apartment for evidence of violations based on an anonymous tip parolee was

selling drugs, parolee's failed drug tests, and a second informant's statement parolee possessed drugs and guns); *cf. United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002) (noting the court's general acceptance of "the common sense proposition that drug dealers often keep evidence of their transactions at home").

**CONCLUSIONS OF LAW**

1. Neither probable cause nor a warrant was necessary to justify the search of Chatman's approved residence on December 14, 2007, because he was on parole and had consented to searches of his "person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole." Ex. G1.

2. Parole agents possessed a reasonable suspicion evidence of parole violations by Chatman would be found in his approved residence on December 14, 2007.

3. The search of Chatman's approved residence on December 14, 2007, did not violate the Fourth Amendment of the United States Constitution or Article I, Section 8 of the Pennsylvania Constitution, and evidence seized during the search therefore will not be suppressed.

An appropriate order follows.

BY THE COURT:


    /s/ Juan R. Sánchez
Juan R. Sánchez, J.